**PAWAR LAW GROUP P.C.**
Vik Pawar, Esq.
20 Vesey Street, Suite 1210
New York, New York 10007
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vik@pawarlaw.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEVE BELL, derivatively on behalf of CANCER GENETICS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> PANNA L. SHARMA, JOHN A. ROBERTS, IGOR GITELMAN, JOHN PAPPAJOHN, RAJU S. K. CHAGANTI, EDMUND CANNON, FRANKLYN G. PRENDERGAST, MICHAEL J. WELSH, GEOFFREY HARRIS, HOWARD MCLEOD, and THOMAS WIDMANN, <br><br> Defendants, <br><br> and <br><br> CANCER GENETICS, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> **(1) VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934;** <br> **(2) BREACH OF FIDUCIARY DUTY; AND** <br> **(3) UNJUST ENRICHMENT** <br><br> <u>JURY TRIAL DEMANDED</u> |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Steve Bell ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Cancer Genetics, Inc. ("Cancer Genetics" or the "Company"), files this

1

Verified Shareholder Derivative Complaint against Individual Defendants Panna L. Sharma, John A. Roberts, Igor Gitelman, John Pappajohn, Raju S. K. Chaganti, Edmund Cannon, Franklyn G. Prendergast, Michael J. Welsh, Geoffrey Harris, Howard McLeod, and Thomas Widmann (collectively, the "Individual Defendants," and together with Cancer Genetics, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Cancer Genetics, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cancer Genetics, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Cancer Genetics' directors and officers from March 23, 2017 through the present (the "Relevant Period").

2.     Cancer Genetics operates in the field of precision medicine, enabling individualized therapies in the field of oncology through its tests, services, and molecular markers.  The Company develops, commercializes, and provides molecular and biomarker-based tests and services that enable biotech and pharmaceutical companies engaged in oncology and immuno-oncology trials

to better select candidate populations and reduce adverse drug reactions by providing information regarding genomic and molecular factors influencing subject responses to therapeutics.

3.    The Company generates revenue from its Biopharma Services, Clinical Services, and Discovery Services businesses.

4.    On April 2, 2018, the Company filed its annual report for the fiscal quarter and year ended December 31, 2017 on Form 10-K with the SEC, which revealed accounting issues and that the Company's "disclosure controls and procedures were not effective at December 31, 2017 as a result of the material weakness in internal controls" discussed further therein.

5.    The Company also filed a press release on April 2, 2018, which further discussed Cancer Genetics' accounting issues.

6.    On this news, the price per share of Cancer Genetics stock fell $0.55, or 33%, from the previous day's trading price, closing at $1.10 on April 3, 2018.

7.    During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

8.    In breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

9.    Moreover, during the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Cancer Genetics, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company failed to maintain internal controls, with such failure including a "material weakness;" (2) the Company needed to make several accounting adjustments, particularly due to an increase in disruptions in collections;

3

and (3) payors, for various reasons, declined to reimburse the Company on certain performed clinical services.

10.     As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

11.     The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

12.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its former Chief Executive Officer ("CEO"), its CEO, and its Chief Accounting Officer ("CAO") to two federal securities fraud class action lawsuits pending in this Court (the "Securities Class Actions"), the need to undertake internal investigations, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

13.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is a current shareholder of Cancer Genetics. Plaintiff has continuously held Cancer Genetics common stock at all relevant times.

### Nominal Defendant Cancer Genetics

20.     Cancer Genetics is a Delaware corporation with its principal executive offices at 201 Route 17 North, 2nd Floor, Rutherford, New Jersey, 07070. Cancer Genetics' shares trade on the NASDAQ under the ticker symbol "CGIX."

**Defendant Sharma**

21.     Defendant Panna L. Sharma ("Sharma") served as the Company's President and CEO and as a Company director from May 2010 to February 2018.  According to the Company's Schedule 14A filed with the SEC on April 21, 2017 (the "2017 Proxy Statement"), as of April 18, 2017, Defendant Sharma beneficially owned 638,666 shares of the Company's common stock, which represented 3.2% of the Company's outstanding common stock.  Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $3.55, Sharma owned over $2.2 million worth of Cancer Genetics' stock.

22.     For the fiscal year ended December 31, 2017, Defendant Panna received $1,078,354 in compensation from the Company.  This included $500,000 in salary, a $250,000 bonus, $327,645 in option awards and $709 in all other compensation.

23.     The Company's 2017 Proxy Statement stated the following about Defendant Panna:

***Panna L. Sharma***[1]

Mr. Sharma became a member of our Board and our President and Chief Executive Officer in May of 2010. Additionally, he serves as the general manager of Oncospire Genomics. Mr. Sharma was at TSG Partners, a specialty life sciences consultancy and advisory company, from 2001 to 2010, where he was the Managing Partner and founder. At TSG he led the development of strategic initiatives, corporate growth strategy and corporate turnarounds for both public and private companies. He also led over 70 buy and sell-side transactions for life sciences, healthcare and biopharma companies. At TSG, he established the Global Diagnostics Index, the Global Biotools Index and several other life science capital markets indices that are still used in the life science industry.

Prior to founding TSG, Mr. Sharma was the Chief Strategy Officer for iXL Enterprises, Inc. ("iXL"), a public e-business consultancy where he led strategy development and acquisitions activity and was part of the management team that aided in taking the company public in June 1999. At iXL, he also managed the specialty e-business strategy practices group that grew from under $4 million in revenue in 1998 to over $75 million in 2000. From 1996 to 1998, Mr. Sharma was a partner at Interactive Solutions, Inc., a marketing and strategy consultancy

---

[1] Emphasis in original unless otherwise noted throughout.

focused on health care and financial services in Cambridge, Massachusetts, that was sold to Omnicom, Inc., one of the largest global market analysis and marketing companies. Prior to that time, Mr. Sharma served as a consultant to Putnam Investment Management, LLC and Bank of America Corporation. Mr. Sharma has also served on the board of directors of EpicEdge, a health care and government focused IT services firm, from 2001 to 2003 and as chairman of the Advisory Board for EndoChoice, a global leader for the gastrointestinal treatment market from 2008 to 2010.

We selected Mr. Sharma to serve on our Board due to his extensive knowledge of our operations, competitive challenges and opportunities gained through his position as our President and Chief Executive Officer as well as his extensive experience as a strategic advisor to companies in the health care and life sciences industry.

### Defendant Roberts

24.     Defendant John A. Roberts ("Roberts") has served as the Company's Chief Operating Officer since July 2016 and in February 2018 was appointed as the Company's interim CEO.  On April 30, 2018 the Board appointed Defendant Roberts as the Company's CEO and President. He also serves as the Company's Executive Vice President, Finance, a role he has held since July 2016.  According to the 2017 Proxy Statement, as of April 18, 2017, Defendant Roberts beneficially owned 26,875 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $3.55, Roberts owned over $95,406 worth of Cancer Genetics' stock.

25.     For the fiscal year ended December 31, 2017, Defendant Roberts received $404,617 in compensation from the Company.  This included $301,604 in salary, a $48,300 bonus, $49,147 in option awards, and $5,566 in all other compensation.

26.     The Company's Form 8-K filed with the SEC on May 1, 2018 stated the following about Defendant Roberts:

Prior to joining Cancer Genetics, from August 1, 2015 to June 30, 2016, Mr. Roberts served as the Chief Financial Officer for VirMedica, Inc., an innovative technology solutions company that provides an end-to-end platform that enables

specialty drug manufacturers and pharmacies to optimize product commercialization and management. Prior to VirMedica, from August 1, 2011 to July 31, 2015, Mr. Roberts was the Chief Financial and Administrative Officer for AdvantEdge Healthcare Solutions, a global healthcare analytics and services organization. Prior to that, Mr. Roberts was the Chief Financial Officer and Treasurer for InfoLogix, Inc., a publicly-traded healthcare-centric mobile software and solutions provider. He has also held CFO roles at leading public medical device and healthcare services firms including Clarient, Inc., a publicly-traded provider of diagnostic laboratory services and Daou Systems, Inc., a publicly-traded healthcare IT software development and services firm. In addition, he has held key senior executive roles with MEDecision, Inc., HealthOnline, Inc. and the Center for Health Information. Mr. Roberts earned a Bachelor of Science and a Master's degree in Business Administration from the University of Maine. He is Chairman of the Board of Directors for the Drug Information Association (DIA), a global neutral forum enabling drug developers and regulators access to insights and collaboration.

**Defendant Gitelman**

27.     Defendant Igor Gitelman ("Gitelman") has served as the Company's CAO since February 2017.

28.     Pursuant to the terms of his offer letter from the Company, Defendant Gitelman is entitled to receive an annual base salary of $190,000 and is eligible for an annual cash bonus of up to 15% of his base salary.  According to the Company's February 13, 2017 Form 8-K filed with the SEC announcing Defendant Gitelman's appointment, "[i]t is anticipated that Mr. Gitelman will receive 15,000 stock options which will vest in equal monthly increments over the subsequent 48 calendar months."

29.     The Company's February 13, 2017 Form 8-K also stated the following about Defendant Gitelman:

Prior to joining the Company, Mr. Gitelman served as an AVP of Finance and Tax at clinical diagnostic laboratory, BioReference Laboratories, Inc., from October 2005 to October 2016. During this time, Mr. Gitelman held various positions of increasing responsibility managing the company's internal audit function, SEC financial reporting, tax and corporate finance functions as well as leading the finance team through numerous mergers and acquisitions while managing the organic growth that BioReference experienced in this time-period. Prior to that role,

Mr. Gitelman was a senior manager of tax and financial reporting at Gucci Group from May 2003 to May 2005 where he managed all aspects of the company's tax planning, compliance and audits on federal, state and international levels as well as the company's tax accounting function. Mr. Gitelman worked as a senior intermediate accountant at UBS Painewebber from May 2000 to April 2003, and, prior to that position, Mr. Gitelman worked as an associate at PricewaterhouseCoopers, LLP from May 1998 to July 1999 serving as a consultant on various clients from July 1999 to May 2000. Mr. Gitelman holds a BBA and an MBA degree in accounting form Pace University's Lubin School of Business. Mr. Gitelman is a Certified Public Accountant.

Mr. Gitelman is a highly competent financial manager with a long track record of enterprise wide profitability maximization, business acumen and building shareholder value. The Company believes he will be a valuable addition to our senior leadership team and beneficial in supporting the Company's continued growth.

**Defendant Pappajohn**

30.     Defendant John Pappajohn ("Pappajohn") has served as a Company director since 2008 and serves as Chairman of the Board.    According to the 2017 Proxy Statement, as of April 18, 2017, Defendant Pappajohn beneficially owned 3,020,274 shares of the Company's common stock, which represented 14.8% of the Company's outstanding common stock.  Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $3.55, Pappajohn owned over $10.7 million worth of Cancer Genetics' stock.

31.     For the fiscal year ended December 31, 2017, Defendant Pappajohn received $273,558 in compensation from the Company.  This included $100,000 in fees earned or cash paid, $17,250 in stock awards, $36,308 in option awards, and $120,000 in all other compensation.

32.     Defendant Pappajohn is the founder of Equity Dynamics, Inc. ("Equity Dynamics"), a financial consulting entity which has provided financial consulting services to the Company since August 2010.  Pursuant to a consulting agreement with the Company, Equity Dynamics earns a monthly fee of $10,000 plus expenses for consulting services, which is reflected in the $120,000 of "all other compensation" noted above.

33.     The Company's 2017 Proxy Statement stated the following about Defendant Pappajohn:

### John Pappajohn

Mr. Pappajohn is the chairman of our Board and is a pioneer in the venture capital industry. In 1969, Mr. Pappajohn founded Equity Dynamics, Inc., a financial consulting entity, and Pappajohn Capital Resources, a venture capital firm, both in Des Moines, Iowa. Mr. Pappajohn has been involved in over 100 start-up companies and has served as a director of over 40 public companies, many in the bioscience and health-related industries. He is currently a member of the board of MYnd Analytics (Nasdaq: CNSO), a data analysis company focused on improving mental health care, where he has served since 2009.

Previously, Mr. Pappajohn served on the boards of ConMed Healthcare Management, Inc. from 2005 until August 2012, PharmAthene, Inc., from 2007 until July 2011, Careguide, Inc., from 1995 until 2010, SpectraScience, Inc., from 2007 until 2009 and American CareSource Holdings, Inc. from 2004 until 2016. Mr. Pappajohn has a BSC degree in business from the University of Iowa.

We selected Mr. Pappajohn to serve on our Board due to his extensive background and experience in providing guidance to a variety of private and public companies in the bioscience and health related industries.

### Defendant Chaganti

34.     Defendant Raju S. K. Chaganti ("Chaganti") is the Company's founder and has served on the Board since the Company's inception in 1999.  According to the 2017 Proxy Statement, as of April 18, 2017, Defendant Chaganti beneficially owned 663,894 shares of the Company's common stock, which represented 3.3% of the Company's outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $3.55, Chaganti owned over $2.3 million worth of Cancer Genetics' stock.

35.     For the fiscal year ended December 31, 2017, Defendant Chaganti received $73,558 in compensation from the Company.  This included $17,250 in stock awards, $36,308 in option awards, and $20,000 in all other compensation.[2]

---

[2] All other compensation reflects a monthly fee of $5,000 for consulting services through April

36.     The Company's 2017 Proxy Statement stated the following about Defendant

Chaganti:

> ### Raju S.K. Chaganti, Ph.D., FACMG.
>
> Dr. Chaganti is our founder and has served on our Board since the Company's inception. Dr. Chaganti is an internationally recognized leader in cancer cytogenetics and molecular genetics. He is an inventor on 10 patents issued by the US patent office, 3 from Memorial Sloan-Kettering Cancer Center KCC and 7 from Cancer Genetics, Inc, all related to cancer gene discovery and cancer genetic analysis. Dr. Chaganti currently is the incumbent of the William E. Snee Chair at the Memorial Sloan-Kettering Cancer Center, where he is on the faculty of the Department of Medicine and Cell Biology Program. He is a Professor at the Gernster Sloan- Kettering Graduate School of Biomedical Sciences and at Weill-Cornell Graduate School of Medicinal Sciences, New York, New York. He was the chief of Memorial Sloan-Kettering Cancer Center's cytogenetics service, which he established in 1976 as one of the earliest genetically based cancer diagnostic services in the country.
>
> Dr. Chaganti received a Ph.D. in biology (genetics) from Harvard University Graduate School of Arts and Sciences and completed his post-doctoral training at the Medical Research Council of Great Britain. Additionally, he completed a sabbatical in the Department of Tumor Biology at Karolinska Institute Stockholm, focusing on experimental murine tumorigenesis and immunology. He has published extensively in genetics with a bibliography of over 380 entries comprising peer reviewed research articles, book chapters, and books. Dr. Chaganti is American Board of Medical Genetics certified in medical genetics, with a subspecialty in clinical cytogenetics. He is also a Founding Fellow of the American College of Medical Genetics.
>
> We selected Dr. Chaganti to serve on our Board due to the perspective and extensive experience he brings as one of our founders, his over 35 years of experience in managing clinical cytogenetic laboratories and his renown as an international leader in the areas of cancer cytogenetics and molecular genetics.

### Defendant Cannon

37.     Defendant Edmund Cannon ("Cannon") has served as a Company director since

2005.  He also serves as a member of the Audit Committee and the Compensation Committee.

According to the 2017 Proxy Statement, as of April 18, 2017, Defendant Cannon beneficially

---

2017.

11

owned 58,394 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $3.55, Cannon owned over $207,298 worth of Cancer Genetics' stock.

38.     For the fiscal year ended December 31, 2017, Defendant Cannon received $73,558 in compensation from the Company.  This included $20,000 in fees earned or cash paid, $17,250 in stock awards, and $36,308 in option awards.

39.     The Company's 2017 Proxy Statement stated the following about Defendant Cannon:

### Edmund Cannon

Edmund Cannon is a member of our Board and is founder and President of the Clinical Research Center of Cape Cod, which specializes in finding institutional review board approved, consented specimens for the diagnostics and pharmaceutical industries, and in setting up studies to support FDA submissions for pharmaceutical and biotechnology companies. Previously, Mr. Cannon was a marketing and operations consultant for Franey Medical Labs. Mr. Cannon also formerly had the most national sales for Pharmacia Diagnostics Inc., and was a vice president and co-founder of Alletess, Inc. Mr. Canon has a degree from Boston State College and attended a Master's program at Providence College.

We selected Mr. Cannon to serve on our Board due to his extensive experience in working with hospitals and oncologists and his world class expertise in clinical trials. Mr. Cannon also serves on our audit committee and as chairman of our compensation committee.

### Defendant Prendergast

40.     Defendant Franklyn G. Prendergast ("Prendergast") has served as a Company director since 2012.  He also serves as a member of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee.  According to the 2017 Proxy Statement, as of April 18, 2017, Defendant Prendergast beneficially owned 45,500 shares of the Company's common stock.  Given that the price per share of the Company's common stock

at the close of trading on April 18, 2017 was $3.55, Prendergast owned $161,525 worth of Cancer Genetics' stock.

41.     For the fiscal year ended December 31, 2017, Defendant Prendergast received $73,558 in compensation from the Company.  This included $20,000 in fees earned or cash paid, $17,250 in stock awards, and $36,308 in option awards.

42.     The Company's 2017 Proxy Statement stated the following about Defendant Prendergast:

**Franklyn G. Prendergast, M.D., Ph.D.**

Franklyn G. Prendergast, M.D., Ph.D., is a member of our Board and, prior to his retirement, was the Emeritus Edmond and Marion Guggenheim Professor of Biochemistry and Molecular Biology and Emeritus Professor of Molecular Pharmacology and Experimental Therapeutics at Mayo Medical School and the director of the Mayo Clinic Center for Individualized Medicine. From 1994 to 2006, he served as a director of Mayo Clinic Cancer Center. He also previously held several other teaching positions at the Mayo Medical School from 1975 through 2014. Dr. Prendergast has served for the National Institute of Health on numerous study section review groups; as a charter member of the Board of Advisors for the Division of Research Grants, now the Center for Scientific Review; the National Advisory General Medical Sciences Council; and the Board of Scientific Advisors of the National Cancer Institute. He held a Presidential Commission for service on the National Cancer Advisory Board. Dr. Prendergast also has served in numerous other advisory roles for the National Institute of Health and the National Research Council of the National Academy of Sciences, and he is a member of the board of directors of the Translational Genomics Research Institute and the Infectious Disease Research Institute (IDRI). Dr. Prendergast has served on the board of directors of Eli Lilly & Co. since 1995 and is a member of the board's science and technology and public policy and compliance committees. Dr. Prendergast will retire from the Eli Lilly board on May 1, 2017. He also currently serves on the board of directors for DemeRx, Inc., a private, biotechnology drug development company, and Ativa Medical Corporation, a private, diagnostic technology company. Dr. Prendergast obtained his medical degree with honors from the University of West Indies and attended Oxford University as a Rhodes Scholar, earning an M.A. degree in physiology. He obtained his Ph.D. in Biochemistry at the University of Minnesota.

We selected Dr. Prendergast to serve on our Board due to his extensive experience and expertise as a medical clinician, researcher and academician, particularly, in the areas of oncology and personalized medicine, developed through his roles with

Mayo Clinic, including serving as director of the Mayo Clinic Cancer Center and the Mayo Clinic Center for Individualized Medicine. Dr. Prendergast also serves on our audit and compensation committees, and serves as chairman of our nominating committee.

**Defendant Welsh**

43.     Defendant Michael J. Welsh ("Welsh") has served as a Company director since 2014. He also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2017 Proxy Statement, as of April 18, 2017, Defendant Welsh beneficially owned 27,540 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $3.55, Welsh owned $97,767 worth of Cancer Genetics' stock.

44.     For the fiscal year ended December 31, 2017, Defendant Welsh received $71,058 in compensation from the Company. This included $17,500 in fees earned or cash paid, $17,250 in stock awards, and $36,308 in option awards.

45.     The Company's 2017 Proxy Statement stated the following about Defendant Welsh:

*Michael J. Welsh, M.D.*

Dr. Welsh is a member of our Board and is a Howard Hughes Medical Institute Investigator, a position he has held since 1989. He is a Professor and the Roy J. Carver Biomedical Research Chair in Internal Medicine and Molecular Physiology and Biophysics at the University of Iowa, a position he has held since 1987. He is also Director of the Cystic Fibrosis Research Center and Director of the Pappajohn Biomedical Institute. Dr. Welsh was elected to the Institute of Medicine in 1997, the American Academy of Arts and Sciences in 1998, and the National Academy of Sciences in 2000. Dr. Welsh has co-founded three companies, Exemplar Genetics, which was purchased by Intrexon Corporation (NYSE: XON) in January 2015, Emmyon, Inc., a privately-held biotechnology company, and Talee Bio, Inc., a privately-held biotechnology company. Dr. Welsh received his MD and internal medicine training at the University of Iowa and trained in pulmonary medicine and research at the University of California at San Francisco and the University of Texas in Houston.

We selected Dr. Welsh to serve on our Board due to his extensive experience as a leading researcher in biomedical engineering. Dr. Welsh also serves on our compensation and nominating committees.

**Defendant Harris**

46.     Defendant Geoffrey Harris ("Harris") has served as a Company director since 2014. He also serves as chair of the Audit Committee.  According to the 2017 Proxy Statement, as of April 18, 2017, Defendant Harris beneficially owned 35,000 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $3.55, Harris owned $124,250 worth of Cancer Genetics' stock.

47.     For the fiscal year ended December 31, 2017, Defendant Harris received $78,558 in compensation from the Company.  This included $25,000 in fees earned or cash paid, $17,250 in stock awards, and $36,308 in option awards.

48.     The Company's 2017 Proxy Statement stated the following about Defendant Harris:

> *Geoffrey Harris*
>
> Geoffrey Harris is a member of our Board and is a managing partner of c7 Advisors (a money management and healthcare advisory firm). From 2011 to 2014 he served as a managing director and co-head of the healthcare investment banking group at Cantor Fitzgerald, and from 2009-2011, he held a similar position at Gleacher & Company. Mr. Harris is also currently on the board of directors of MYnd Analytics (Nasdaq: CNSO), a data analysis company focused on improving mental health care, connectRN, a private company focused on nurse staffing, and PointRight Inc., a privately-held software company. Mr. Harris graduated from MIT's Sloan School of Management with an MS in Finance Management.
>
> We selected Mr. Harris to serve on our Board due to his experience and leadership in healthcare advisory and policy research positions. Mr. Harris also serves as the chairman of our audit committee.

**Defendant McLeod**

49.     Defendant Howard McLeod ("McLeod") has served as a Company director since 2014.  He also serves as a member of the Nominating and Corporate Governance Committee.

According to the 2017 Proxy Statement, as of April 18, 2017, Defendant McLeod beneficially owned 23,500 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $3.55, McLeod owned $83,425 worth of Cancer Genetics' stock.

50.     For the fiscal year ended December 31, 2017, Defendant McLeod received $68,558 in compensation from the Company.  This included $15,000 in fees earned or cash paid, $17,250 in stock awards, and $36,308 in option awards.

51.     The Company's 2017 Proxy Statement stated the following about Defendant McLeod:

> **_Howard McLeod, Pharm.D._**
>
> Dr. McLeod is a member of our Board and is the Medical Director of the DeBartolo Family Personalized Medicine Institute at the Moffitt Cancer Center, and as a Senior Member of the Moffitt Cancer Center's Division of Population Sciences. He also chairs the Department of Individualized Cancer Management at Moffitt. He joined Moffitt Cancer Center in September 2013, after having served as a Founding Director of the University of North Carolina Institute for Pharmacogenomics and Individualized Therapy since 2006. Dr. McLeod also held the prestigious title of Fred Eshelman Distinguished Professor at the UNC Eshelman School of Pharmacy from 2006 to 2013. Dr. McLeod has published over 500 peer-reviewed papers on pharmacogenomics, applied therapeutics and clinical pharmacology. He had served as Chief Scientific Advisor and a member of the board of directors of Gentris Corporation before its acquisition by the Company in July 2014 and has served since July 2014 on the Company's Scientific Advisory Board.
>
> We selected Dr. McLeod to serve on our Board due to his vast experience in individualized medical treatment, including his leading research in pharmacogenomics along with his experience as a board member of Gentris. Dr. McLeod also serves on our nominating committee.

**<u>Defendant Widmann</u>**

52.     Defendant Thomas Widmann ("Widmann") has served as a Company director since November 2017.

53.     Defendant Widmann is entitled to an annual base fee of $15,000, an annual fee of $2,500 for membership on the Audit or Compensation Committee, an annual restricted stock award of 2,500 shares of Company common stock, and an annual option grant to purchase 10,000 shares of Company common stock.

54.     The Company's Form 10-K/A filed with the SEC on April 30, 2018 stated the following about Defendant Widmann:

### Dr. Thomas F. Widmann

Dr. Thomas F. Widmann is a member of our Board and is a cardiologist and seasoned life sciences entrepreneur with more than 25 years of biotech experience, and also serves as a Venture Partner at Wellington Partners in Germany. In 1997, he co-founded Actelion Pharmaceuticals, Europe's largest biopharmaceutical company. As Actelion's first Chief Executive Officer and Vice Chairman of the Board, he established affiliates in North America, Europe, and Asia. Dr. Widmann has founded several other successful companies including, Hesperion Ltd, an international Contract Research Organization (CRO); Widmann Associates Ltd.; and Auraglobe Ltd., both life-science advisory companies. Previously, he spent nine years at Hoffmann-La Roche (HLR), Basel, leading the international cardiovascular development department, where he brought three cardiovascular drugs to the international markets. He spent six years at the University of California at San Diego (UCSD) as an assistant professor of Medicine. Dr. Widmann studied Medicine and Computer Science at the Universities of Heidelberg and Paris, and holds a Doctorate in Medicine from the University of Heidelberg. He earned his specialization in cardiology at the University of Geneva in Switzerland.

We selected Dr. Widmann to serve on our Board due to his extensive experience and expertise as a cardiologist and his extensive experience as an investor, executive and founder of biotechnology companies.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

55.     By reason of their positions as officers and/or directors of Cancer Genetics and because of their ability to control the business and corporate affairs of Cancer Genetics, the Individual Defendants owed Cancer Genetics and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Cancer Genetics in a fair, just, honest, and equitable manner. The Individual

Defendants were and are required to act in furtherance of the best interests of Cancer Genetics and its shareholders so as to benefit all shareholders equally.

56.     Each director and officer of the Company owes to Cancer Genetics and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

57.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Cancer Genetics, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

58.     To discharge their duties, the officers and directors of Cancer Genetics were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

59.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Cancer Genetics, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Cancer Genetics' Board at all relevant times.

60.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

61.     To discharge their duties, the officers and directors of Cancer Genetics were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Cancer Genetics were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New Jersey, and the United States, and pursuant to Cancer Genetics' own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Cancer Genetics conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Cancer Genetics and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Cancer Genetics' operations would comply with all applicable laws and Cancer Genetics' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

62.     Each of the Individual Defendants further owed to Cancer Genetics and the shareholders the duty of loyalty requiring that each favor Cancer Genetics' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

63.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Cancer Genetics and were at all times acting within the course and scope of such agency.

64.     Because of their advisory, executive, managerial, and directorial positions with Cancer Genetics, each of the Individual Defendants had access to adverse, non-public information about the Company.

65.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Cancer Genetics.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

66.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

67.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

68.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually

took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Cancer Genetics was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

69.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

70.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Cancer Genetics, and was at all times acting within the course and scope of such agency.

## CANCER GENETICS' CODE OF ETHICS

71.     Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Ethics"), "[e]very director, officer and employee of the Company must acknowledge his or her review of, and agreement to comply with, [the Code of Ethics] as a condition of his or her continued relationship with the Company."

72.     The Code of Ethics provides, as to the requirement to "Maintain Fiduciary Duties and Obligations," that:

> Directors and officers must be loyal to the Company and must act at all times in the best interest of the Company and its shareholders and subordinate self-interests to the corporate and shareholder good. Directors and officers should never use their position to make a personal profit. Directors and officers must perform their duties in good faith, with sound business judgment and with the care of a prudent person.

73.     The Code of Ethics provides, as to a "Conflict of Interest," that:

All directors, officers, and employees owe a duty of loyalty to the Company and must avoid any business, financial, or other direct or indirect interests or relationships which conflict with or which divide his or her loyalty to the Company. A "conflict of interest" occurs when the private interest of a director, officer, or employee interferes in any way, or appears to interfere with the interests of the Company as a whole. Conflicts of interest also arise when a director, officer, or employee, or a member of his or her family receives improper personal benefits as a result of his or her position with the Company. Any activity which even appears to present such a conflict must be avoided or terminated unless, after full disclosure to the Chairman of the Board, it is determined by the Board that the activity is not harmful to the Company or otherwise improper.

74.     The Code of Ethics provides, as to "Compliance with Laws, Rules, and Regulations," that:

Obeying the law, both in letter and in spirit, is the foundation on which this Company's ethical standards are built. Directors, officers, and employees shall comply, and oversee compliance by others, with all laws, rules, and regulations applicable to the Company. Although not all employees are expected to know the details of these laws, it is important to know enough to determine when to seek advice from supervisors, managers, or other appropriate personnel.

75.     The Code of Ethics provides, as to "Accuracy of Books and Records and Financial Reporting," that:

The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions. All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. All Company business data, records and reports must be prepared truthfully and accurately. If you use a business expense account or a corporate credit card, expenses to be reimbursed must be documented and recorded accurately. If you are not sure whether an expense is appropriate, ask your supervisor. The Company's business records must be maintained for the periods specified in the Company's applicable record retention policies. Employees who are responsible for accounting matters and/or contribute to or prepare the Company's financial statements, periodic reports filed with the Securities and Exchange Commission or other public disclosure documents or communications should do so in accordance with the following guidelines:

• All accounting records, as well as reports produced from those records, must be prepared in accordance with the laws of each applicable jurisdiction.

- All records must fairly and accurately reflect the transactions or occurrences to which they relate.
- All records must fairly and accurately reflect, in reasonably detail, the Company's assets, liabilities, revenues and expenses.
- The Company's accounting records must not contain any false or intentionally misleading entries.
- No transactions should be intentionally misclassified as to accounts, departments or accounting periods.
- All transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period.
- No information should be concealed from internal auditors or independent auditors.
- Compliance with the Company's system of internal accounting controls is required.

76.     The Code of Ethics provides, as to "Communications with the Press, Analysts and

Shareholders and other Outside Entities," that:

> As a public company, CGI must comply with certain legal and regulatory requirements in connection with the dissemination of information to the investing public. To ensure compliance with applicable legal and regulatory requirements, no officer, director or employee, other than an Authorized Spokesperson (as defined below), may discuss news or events concerning the CGI with shareholders, potential investors, investment companies, investment managers, broker-dealers, analysts, members of the press or general media or any other person who is not affiliated with CGI or is not otherwise subject to confidentiality obligations regarding CGI information. For purposes of this policy, Authorized Spokesperson shall mean the Chief Executive Officer (the "CEO"), the Chief Financial Officer (the "CFO") or persons specifically designated by the CEO or CFO to speak with respect to a particular topic or purpose. If any director, officer or employee who is not an Authorized Spokesperson receives an inquiry about CGI, they must refer the inquiry to an Authorized Spokesperson[.] Directors, officers and employees are also required to comply with any more specific policy on corporate communications that may be adopted by the Company.

77.     The Code of Ethics provides, as to "Implementation" of the Code of Ethics, that:

> All directors, officers and employees must sign a statement certifying that they have read and understand this Code. Violations of this Code or of any direction given by management in order to effect the provisions, goals, and aims of this Code may result in disciplinary action, up to and including termination for cause of employment and, if applicable, removal as an officer or director.

78.     The Code of Ethics provides, as to "Reporting Violations of the Code," that:

Employees are responsible for being aware of the corporate policies applicable to their activities and to comply with them fully. If you become aware of a violation of this Code or believe that a violation may take place in the future, you must promptly report the matter. Failure to report a known violation allows misconduct to go unremedied and is itself grounds for discipline. Ordinarily, the report may be made to the employee's immediate supervisor who, in turn, must report it to the Compliance Officer. If the report pertains to concerns regarding questionable accounting or auditing matters, the employee should direct the report to the Compliance Officer or to the Chair of the Audit Committee of the Board of Directors as described in the Company's policy entitled "Employee Complaint Procedures for Accounting and Auditing Matters."

79.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

80.     Cancer Genetics operates in the field of precision medicine, enabling individualized therapies in the field of oncology through its tests, services, and molecular markers.  The Company develops, commercializes, and provides molecular- and biomarker-based tests and services that enable biotech and pharmaceutical companies engaged in oncology and immuno-oncology trials to better select candidate populations and reduce adverse drug reactions by providing information regarding genomic and molecular factors influencing subject responses to therapeutics.

81.     The Company generates revenue from its Biopharma Services, Clinical Services, and Discovery Services businesses.

82.     On October 12, 2015, the Company announced the October 9, 2015 closing of its acquisition of Response Genetics, Inc., a Los Angeles-based molecular profiling laboratory, which enabled the Company to add $10-12 million in annual revenue and establish a national, clinical sales footprint.

**False and Misleading Statements**

***2016 Form 10-K***

83.     On March 23, 2017, the Company filed its annual report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2016 (the "2016 10-K"), signed by Defendants Sharma, Roberts, Gitelman, Pappajohn, Harris, Cannon, McLeod, Welsh, Chaganti, and Prendergast.  The 2016 10-K failed to disclose that: (1) the Company failed to maintain internal controls, with such failure including a "material weakness;" (2) the Company needed to make several accounting adjustments, particularly due to an increase in disruptions in collections; and (3) payors, for various reasons, declined to reimburse the Company on certain performed clinical services.

84.     The 2016 10-K discussed Cancer Genetics' disclosure controls and procedures, stating, in relevant part:

*Evaluation of Disclosure Controls and Procedures.*

We evaluated, under the supervision and with the participation of our principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934 ("Exchange Act"), as amended) as of December 31, 2016, the end of the period covered by this report on Form 10-K. Based on this evaluation, the principal executive officer and the principal financial officer have concluded that our disclosure controls and procedures were effective at December 31, 2016. Disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and were operating in an effective manner for the period covered

by this report, and (ii) is accumulated and communicated to management, including, the principal executive officer and principal financial officer, or the person performing similar functions as appropriate, to allow timely decisions regarding required disclosures.

85.    The 2016 10-K additionally provided management's report on the Company's

internal control over financial reporting, stating, in relevant part:

*Management's Report on Internal Control Over Financial Reporting.*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934.

The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;
- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of our management and directors; and
- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to risk that controls may become inadequate because of changes in conditions or because of declines in the degree of compliance with policies or procedures.

Our management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2016. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control-Integrated Framework (2013).*

Based on management's assessment, as of December 31, 2016, the Company's internal control over financial reporting was effective.

86.     The 2016 10-K also noted no changes in the Company's internal control over financial reporting for the three months ended December 31, 2016, that have, or were reasonably likely to materially affect, the Company's internal control over financial reporting, stating, in relevant part:

> *Changes in Internal Control over Financial Reporting.*
>
> There were no changes in our internal control over financial reporting during the three months ended December 31, 2016 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

87.     Attached to the 2016 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Sharma and Roberts attesting to the accuracy of the 2016 10-K.

**2017 Proxy Statement**

88.     On April 21, 2017, the Company filed the 2017 Proxy Statement, which failed to disclose that: (1) the Company failed to maintain internal controls, with such failure including a "material weakness;" (2) the Company needed to make several accounting adjustments, particularly due to an increase in disruptions in collections; and (3) payors, for various reasons, declined to reimburse the Company on certain performed clinical services.[3]

89.     Moreover, due to the Individual Defendants' violations of the Code of Ethics, the 2017 Proxy Statement was false and misleading in representing that Cancer Genetics adopted the Code of Ethics, and that it applied to Cancer Genetics' directors, officers, and employees.

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

### 1Q 2017 Form 10-Q

90.     On May 12, 2017, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2017 (the "1Q 2017 10-Q"), signed by Defendants Sharma, Roberts, and Gitelman.  The 1Q 2017 10-Q failed to disclose that: (1) the Company failed to maintain internal controls, with such failure including a "material weakness;" (2) the Company needed to make several accounting adjustments, particularly due to an increase in disruptions in collections; and (3) payors, for various reasons, declined to reimburse the Company on certain performed clinical services.

91.     The 1Q 2017 10-Q discussed Cancer Genetics' disclosure controls and procedures, stating, in relevant part:

*Evaluation of Disclosure Controls and Procedures*

We evaluated, under the supervision and with the participation of the principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934 ("Exchange Act"), as amended, as of March 31, 2017, the end of the period covered by this report on Form 10-Q. Based on this evaluation, our President and Chief Executive Officer (principal executive officer) and our Chief Operating Officer (principal financial officer) have concluded that our disclosure controls and procedures were effective at the reasonable assurance level at March 31, 2017.

92.     The 1Q 2017 10-Q also noted no changes in the Company's internal control over financial reporting for the three months ended March 31, 2017, that have, or were reasonably likely to materially affect, the Company's internal control over financial reporting, stating, in relevant part:

*Changes in Internal Control over Financial Reporting*

There were no changes in our internal control over financial reporting during the three months ended March 31, 2017 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

93.     Attached to the 1Q 2017 10-Q were SOX Certifications signed by Defendants Sharma and Roberts, attesting to the accuracy of the 1Q 2017 10-Q.

***2Q 2017 Form 10-Q***

94.     On August 14, 2017, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2017 (the "2Q 2017 10-Q"), signed by Defendants Sharma, Roberts, and Gitelman.   The 2Q 2017 10-Q failed to disclose that: (1) the Company failed to maintain internal controls, with such failure including a "material weakness;" (2) the Company needed to make several accounting adjustments, particularly due to an increase in disruptions in collections; and (3) payors, for various reasons, declined to reimburse the Company on certain performed clinical services.

95.     The 2Q 2017 10-Q discussed Cancer Genetics' disclosure controls and procedures, stating, in relevant part:

*Evaluation of Disclosure Controls and Procedures*

We evaluated, under the supervision and with the participation of the principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934 ("Exchange Act"), as amended, as of June 30, 2017, the end of the period covered by this report on Form 10-Q. Based on this evaluation, our President and Chief Executive Officer (principal executive officer) and our Chief Operating Officer (principal financial officer) have concluded that our disclosure controls and procedures were effective at the reasonable assurance level at June 30, 2017.

96.     The 2Q 2017 10-Q also noted no changes in the Company's internal control over financial reporting for the three months ended June 30, 2017, that have, or were reasonably likely to materially affect, the Company's internal control over financial reporting, stating, in relevant part:

*Changes in Internal Control over Financial Reporting*

There were no changes in our internal control over financial reporting during the three months ended June 30, 2017 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

97.     Attached to the 2Q 2017 10-Q were SOX Certifications signed by Defendants Sharma and Roberts, attesting to the accuracy of the 2Q 2017 10-Q.

### 3Q 2017 Form 10-Q

98.     On November 13, 2017, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2017 (the "3Q 2017 10-Q"), signed by Defendants Sharma, Roberts, and Gitelman.  The 3Q 2017 10-Q failed to disclose that: (1) the Company failed to maintain internal controls, with such failure including a "material weakness;" (2) the Company needed to make several accounting adjustments, particularly due to an increase in disruptions in collections; and (3) payors, for various reasons, declined to reimburse the Company on certain performed clinical services.

99.     The 3Q 2017 10-Q discussed Cancer Genetics' disclosure controls and procedures, stating, in relevant part:

Evaluation of Disclosure Controls and Procedures

We evaluated, under the supervision and with the participation of the principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934 ("Exchange Act"), as amended, as of September 30, 2017, the end of the period covered by this report on Form 10-Q. Based on this evaluation, our President and Chief Executive Officer (principal executive officer) and our Chief Operating Officer (principal financial officer) have concluded that our disclosure controls and procedures were effective at the reasonable assurance level at September 30, 2017.

100.     The 3Q 2017 10-Q also noted no changes in the Company's internal control over financial reporting for the three months ended September 30, 2017, that have, or were reasonably

likely to materially affect, the Company's internal control over financial reporting, stating, in relevant part:

> *Changes in Internal Control over Financial Reporting*
>
> There were no changes in our internal control over financial reporting during the three months ended September 30, 2017 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

101.    Attached to the 3Q 2017 10-Q were SOX Certifications signed by Defendants Sharma and Roberts, attesting to the accuracy of the 3Q 2017 10-Q.

### December 8, 2017 Press Release

102.    On December 8, 2017, the Company issued a press release announcing its pricing of a $7 million registered direct offering scheduled to close on December 12, 2017.  The press release failed to disclose that: (1) the Company failed to maintain internal controls, with such failure including a "material weakness;" (2) the Company needed to make several accounting adjustments, particularly due to an increase in disruptions in collections; and (3) payors, for various reasons, declined to reimburse the Company on certain performed clinical services.

103.    The press release stated, in relevant part:

> RUTHERFORD, N.J., Dec. 08, 2017 (GLOBE NEWSWIRE) -- Cancer Genetics, Inc. (Nasdaq:CGIX), a leader in enabling precision medicine for oncology through molecular markers and diagnostics, today announced the pricing of a registered direct offering of 3,500,000 units at a purchase price of $2.00 per unit. The gross proceeds are expected to be $7.0 million, prior to deducting any placement agent fees or other offering-related expenses.
>
> H.C. Wainwright & Co. is acting as the exclusive placement agent for the offering. Each unit consists of one share of Cancer Genetics common stock and one warrant to purchase a share of common stock at an exercise price of $2.35 per share. Each warrant will be exercisable 6 months following the date of issuance and will expire 18 months from the date of issuance.
>
> The closing of the offering is expected to take place on or about December 12, 2017, subject to the satisfaction of customary closing conditions.

The securities are being offered by Cancer Genetics pursuant to a "shelf" registration statement on Form S-3 that was filed and declared effective by the Securities and Exchange Commission ("SEC") and the base prospectus contained therein (File No. 333-218229). The offering of the securities will be made only by means of a prospectus. A prospectus supplement and accompanying base prospectus relating to the securities being offered will be filed with the SEC. Copies of the final prospectus supplement and accompanying base prospectus may be obtained, when available, on the SEC's website at http://www.sec.gov or by contacting H.C. Wainwright & Co., LLC at 430 Park Avenue, 4th Floor, New York, NY 10022, by phone at 646-975-6996 or e-mail at placements@hcwco.com.

**The Truth Emerges**

***2017 Form 10-K***

104.    On April 2, 2018, the Company filed its annual report on Form 10-K for the fiscal quarter and year ended December 31, 2017 (the "2017 10-K").   In addressing Cancer Genetics' disclosure controls and procedures, the 2017 10-K disclosed that the Company's "disclosure controls and procedures were not effective at December 31, 2017 as a result of the material weakness in internal controls . . . ."   The 2017 10-K stated, in relevant part:

*Evaluation of Disclosure Controls and Procedures.*

We evaluated, under the supervision and with the participation of our principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934 ("Exchange Act"), as amended) as of December 31, 2017, the end of the period covered by this report on Form 10-K. Based on this evaluation, the principal executive officer and the principal financial officer have concluded that our disclosure controls and procedures were not effective at December 31, 2017 as a result of the material weakness in internal controls described below. Disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and were operating in an effective manner for the period covered by this report, and (ii) is accumulated and communicated to management, including, the principal executive officer and principal financial officer, or the person performing similar functions as appropriate, to allow timely decisions regarding required disclosures.

105.    The 2017 10-K further discussed the material weakness and its relationship to uncollectible clinical services revenue, stating, in relevant part:

> Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to risk that controls may become inadequate because of changes in conditions or because of declines in the degree of compliance with policies or procedures. Our management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2017. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control-Integrated Framework (2013)*.
>
> In connection with this assessment, we identified a material weakness, as described below, in our internal control over financial reporting as of December 31, 2017. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement for the annual or interim financial statements will not be prevented or detected on a timely basis. Because of the material weakness identified below, and based on management's assessment, as of December 31, 2017, the Company's internal control over financial reporting was not effective:
>
> Accounting for uncollectible clinical services revenue: The Company's quarterly and year- end review procedures includes management's assessment of collectability and adjustment of its allowance for doubtful accounts. During the fourth quarter management revised its estimation process and as a result of the low collection patterns during the fourth quarter principally related to clinical service revenues from claims generated by the Los Angeles location, a determination was made to significantly increase the allowance for doubtful accounts to reflect this change in estimate, and our management has determined that this control deficiency constitutes a material weakness at December 31, 2017. However, the Company failed to identify that adjustments which pertained to contractual allowances and reduced expected collections of current quarter revenues should have been recorded as reductions in net revenue rather than bad debt expense. Accordingly, management needed to record audit adjustments to properly account for these items. Although management does perform overall review of revenue and related reserves at each reporting date, the controls designed to identify material misstatements did not operate at a sufficient level of precision to prevent or detect such errors in its determination of this significant accounting estimate.

*April 2, 2018 Press Release*

106.    On April 2, 2018, the Company issued a press release announcing its financial results and business updates, including "disruptions in collections" in the Company's Clinical Services business.  The press release stated, in relevant part:

> A major area of concentrated focus during the first quarter of 2018 was the careful evaluation of the Company's accounts receivables, which had increased to approximately $16 million on the balance sheet prior to any adjustments. A significant reason for the increase was disruptions in collections in its Clinical Services business. While the Company continues with its collections efforts on all claims, in the fourth quarter it recorded a bad debt expense of $4.4 million and wrote off $1.8 million of its accounts receivable, with a significant portion of the bad debt expense and write off related to collection issues with respect to the accounts receivable recorded subsequent to the 2015 acquisition of Response Genetics Inc. Payors have declined to reimburse the Company on certain performed Clinical services due to delays in filing its claims, the demands by payors for copies of patient medical records or diagnosis codes which have been difficult to obtain, and reimbursement challenges for certain of our next generation sequencing tests by Medicare and third-party managed care plans, among other reasons. As such, the Company has made a prudent decision to write these off in the fourth quarter. Management believes that its current outstanding accounts receivables are collectible, net of the allowance for doubtful accounts.

107.    On this news, the price per share of Cancer Genetics stock fell $0.55, or 33%, from the previous day's trading price, closing at $1.10 on April 3, 2018.

108.    In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.

109.    Moreover, the Individual Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

110.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

111.    During a May 15, 2018 call with analysts and investors, and in a press release issued the same day, the Company disclosed that, in order to optimize efficiency, it would be closing the Los Angeles lab formerly known as Response Genetics in the subsequent five months.

## DAMAGES TO CANCER GENETICS

112.    As a direct and proximate result of the Individual Defendants' conduct, Cancer Genetics will lose and expend many millions of dollars.

113.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its former CEO, its CEO, and its CAO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

114.    Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

115.    As a direct and proximate result of the Individual Defendants' conduct, Cancer Genetics has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

116.    Plaintiff brings this action derivatively and for the benefit of Cancer Genetics to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Cancer Genetics, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

117.    Cancer Genetics is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

118.    Plaintiff is, and has been at all relevant times, a shareholder of Cancer Genetics. Plaintiff will adequately and fairly represent the interests of Cancer Genetics in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

119.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

120.    A pre-suit demand on the Board of Cancer Genetics is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Pappajohn, Cannon, Chaganti, Harris, McLeod, Prendergast, Welsh, and Widmann (the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

121.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

122.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company

appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

123.    Additional reasons that demand on Defendant Pappajohn is futile follow. Defendant Pappajohn has served as a Company director since 2008 and serves as Chairman of the Board. Defendant Pappajohn controls Equity Dynamics, which provides consulting services to the Company for a monthly fee of $10,000 plus expenses. Pappajohn may fear retaliation against Equity Dynamics, in addition to himself, if he were to grant a demand. He is, as the Company admits, a non-independent director. He received lavish compensation, including $273,558 in 2017. His large Company stock holding, representing a 14.8% ownership of the Company and worth over $10.7 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As Chairman of the Board, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Pappajohn signed, and thus personally made the false and misleading statements in, the 2016 10-K referenced herein.  Defendant Pappajohn is the Founder and President of Pappajohn Capital Resources, a venture capital firm. Venture capitalists compete to fund entrepreneurs, and future investment opportunities for Defendant Pappajohn and Pappajohn Capital Resources may be chilled if he were to grant a demand. For these reasons, too, Defendant Pappajohn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

124.    Additional reasons that demand on Defendant Chaganti is futile follow. Defendant Chaganti is the Company's founder and has served as a Company director since the Company's inception in 1999.  He is, as the Company admits, a non-independent director.  His large Company stock holding, representing a 3.3% ownership of the Company and worth over $2.3 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As the Company's founder and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Chaganti signed, and thus personally made the false and misleading statements in, the 2016 10-K referenced herein.  For these reasons, too, Defendant Chaganti breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

125.    Additional reasons that demand on Defendant Cannon is futile follow. Defendant Cannon has served as a Company director since 2005 and serves as a member of the Audit Committee and the Compensation Committee.  His large Company stock holding, worth over $207,298 before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As a member of the Audit Committee and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Cannon signed, and thus personally made the false and misleading statements in, the 2016 10-K referenced herein.  For these reasons, too, Defendant

Cannon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

126.   Additional reasons that demand on Defendant Prendergast is futile follow. Defendant Prendergast has served as a Company director since 2012 and serves as a member of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee.  His large Company stock holding, worth $161,525 before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As a member of the Audit Committee and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Prendergast signed, and thus personally made the false and misleading statements in, the 2016 10-K referenced herein.  For these reasons, too, Defendant Prendergast breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

127.   Additional reasons that demand on Defendant Welsh is futile follow. Defendant Welsh has served as a Company director since 2014 and serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee.  His large Company stock holding, worth $97,767 before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

Moreover, Defendant Welsh signed, and thus personally made the false and misleading statements in, the 2016 10-K referenced herein.  For these reasons, too, Defendant Welsh breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128.    Additional reasons that demand on Defendant Harris is futile follow. Defendant Harris has served as a Company director since 2014 and serves as chair of the Audit Committee. His large Company stock holding, worth $124,250 before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As chair of the Audit Committee and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Harris signed, and thus personally made the false and misleading statements in, the 2016 10-K referenced herein.  For these reasons, too, Defendant Harris breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

129.    Additional reasons that demand on Defendant McLeod is futile follow. Defendant McLeod has served as a Company director since 2014 and serves as a member of the Nominating and Corporate Governance Committee.  His large Company stock holding, worth $83,425 before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously

disregarded his duties to protect corporate assets. Moreover, Defendant McLeod signed, and thus personally made the false and misleading statements in, the 2016 10-K referenced herein. For these reasons, too, Defendant McLeod breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130.    Additional reasons that demand on Defendant Widmann is futile follow. Defendant Widmann has served as a Company director since November 2017. His entitlement to potentially obtain over 10,000 shares of Company stock reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Widmann breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

131.    Additional reasons that demand on the Board is futile follow.

132.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

133.    For example, Defendant Welsh is the Director of the Pappajohn Biomedical Institute, a scientific community seeking to understand the fundamental of biology and disease through interdisciplinary research, as well as a professor at the University of Iowa since 1987.

Defendant Pappajohn, for whom the institute is named, is a significant donor to the institute and the University of Iowa, in which the institute is housed. These personal and professional connections, combined with the substantial likelihood of liability that both Defendant Pappajohn and Defendant Welsh face in the instant action, prevent either Defendant from evaluating a demand with independence or disinterest.

134.    All of the Directors breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Directors may not be indemnified for breaching the duty of candor. As a result, all of the Directors face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

135.    In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Ethics, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

136.    Cancer Genetics has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for

Cancer Genetics any part of the damages Cancer Genetics suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

137.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

138.   The acts complained of herein constitute violations of fiduciary duties owed by Cancer Genetics' officers and directors, and these acts are incapable of ratification.

139.   The Directors may also be protected against personal liability for their breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Cancer Genetics. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Cancer Genetics, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists,

will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

140.     If there is no directors' and officers' liability insurance, then the Directors will not cause Cancer Genetics to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

141.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

142.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

143.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

144.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

145.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

146.    Under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose that: (1) the Company failed to maintain internal controls, with such failure including a "material weakness;" (2) the Company needed to make several accounting adjustments, particularly due to an increase in disruptions in collections; and (3) payors, for various reasons, declined to reimburse the Company on certain performed clinical services.

147.    Moreover, the 2017 Proxy Statement was false and misleading in discussing the Company's adherence to specific governance policies and procedures, including the Code of Ethics, due to the Individual Defendants' failure to abide by them and to their making and or permitting the Company to make the false and misleading statements and omissions of material fact referenced herein.

148.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination

in the 2017 Proxy Statement, including election of directors and ratification of the appointment of an independent registered public accounting firm.

149.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

150.    Plaintiff on behalf of Cancer Genetics has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

151.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

152.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Cancer Genetics' business and affairs.

153.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

154.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Cancer Genetics.

155.    In breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

156.    In further breach of their fiduciary duties owed to Cancer Genetics, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company failed to maintain internal controls, with such failure including a "material weakness;" (2) the Company

needed to make several accounting adjustments, particularly due to an increase in disruptions in collections; and (3) payors, for various reasons, declined to reimburse the Company on certain performed clinical services.  As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

157.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

158.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Cancer Genetics' securities.

159.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly

or recklessly and for the purpose and effect of artificially inflating the price of Cancer Genetics'
securities.

160.    These actions were not a good-faith exercise of prudent business judgment to
protect and promote the Company's corporate interests.

161.    As a direct and proximate result of the Individual Defendants' breaches of their
fiduciary obligations, Cancer Genetics has sustained and continues to sustain significant damages.
As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

162.    Plaintiff on behalf of Cancer Genetics has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

163.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth
above, as though fully set forth herein.

164.    By their wrongful acts, violations of law, and false and misleading statements and
omissions of material fact that they made and/or caused to be made, the Individual Defendants
were unjustly enriched at the expense of, and to the detriment of, Cancer Genetics.

165.    The Individual Defendants either benefitted financially from the improper conduct
or received bonuses, stock options, or similar compensation from Cancer Genetics that was tied to
the performance or artificially inflated valuation of Cancer Genetics, or received compensation
that was unjust in light of the Individual Defendants' bad faith conduct.

166.    Plaintiff, as a shareholder and a representative of Cancer Genetics, seeks restitution
from the Individual Defendants and seeks an order from this Court disgorging all profits, including
from insider transactions, benefits, and other compensation, including any performance-based or
valuation-based compensation, obtained by the Individual Defendants due to their wrongful
conduct and breach of their fiduciary and contractual duties.

167.   Plaintiff on behalf of Cancer Genetics has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Cancer Genetics, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Cancer Genetics;

(c)   Determining and awarding to Cancer Genetics the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Cancer Genetics and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Cancer Genetics and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Cancer Genetics to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations;

      (e)    Awarding Cancer Genetics restitution from Individual Defendants, and each of them;

      (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)    Granting such other and further relief as the Court may deem just and proper.

Dated: June 1, 2018            Respectfully submitted,

**PAWAR LAW GROUP P.C.**

*s/ Vik Pawar*
Vik Pawar
20 Vesey Street, Suite 1210
New York, New York 10007
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vik@pawarlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*